■ In the Matter of KAREN Y., Alleged to be a Permanently Neglected Child or Child of a Mentally Ill Parent. ST. LAWRENCE COUNTY DEPARTMENT OF SOCIAL SERVICES, Respondent; HIRAM Y., Appellant. (And Five Other Related Proceedings.)— Levine, J. Appeals from two orders of the Family Court of St. Lawrence County (Nelson, J.), entered August 25, 1988, which granted petitioner's applications, in six proceedings pursuant to Social Services Law § 384-b, to adjudicate respondents' children to be children of a mentally ill or mentally retarded parent, and terminated respondents' parental rights.

Respondents are the parents of three children. They appeal from orders of Family Court terminating their parental rights. In 1984, the children were adjudicated as neglected and placed in the custody of petitioner, the St. Lawrence County Department of Social Services (hereinafter DSS). That proceeding arose out of an investigation disclosing that the two daughters of respondents had been sexually abused. In September 1987, while the children were still in foster care, DSS filed separate petitions against the father seeking termination of parental rights as to each child on, inter alia, the statutory ground of his mental illness rendering him incapable then or for the foreseeable future to provide proper and adequate care for the children (Social Services Law § 384-b [4] [c]). Petitions were also filed against the mother invoking the same statutory ground of mental incompetency, in her case, by reason of mental retardation.

At the hearings conducted before Family Court, DSS submitted overwhelming and uncontradicted evidence of the fa-

ther's profound and chronic mental illness, diagnosed as schizophrenia, paranoid type. Three psychiatrists who had examined him testified to this effect, that his condition would continue for the foreseeable future and that under his care the children would be neglected. Relative portions of the father's records of four commitments to St. Lawrence Psychiatric Center from 1979 to 1987 were also introduced, revealing a consistent diagnosis and essentially an unchanged condition. The records also show a pattern of resistance to taking prescribed medication, delusional ideas including contemplated acts of serious violence and other bizarre behavior. His criminal record disclosed convictions for assault, reckless endangerment and other crimes.

On appeal, the father's primary contention is that DSS, during the period of foster care, withheld contact with the children from him and failed to offer services to ascertain whether such services could have assisted him in providing adequate care for the children. It is urged that the absence of contact and offer of services renders the evidence insufficient, as a matter of law. We disagree. In a termination case based upon mental incapacity, no proof is required of a child care agency's diligent efforts to encourage and strengthen the parental relationship (Social Services Law § 384-b [4] [c]; [6]; cf., Social Services Law § 384-b [7] [a] [permanent neglect]; Matter of Jammie CC., 149 AD2d 822, 823). While under many circumstances the mental incapacity of the parent to provide care must take into account the measures the agency took to maintain the family setting (see, Matter of Joyce T., 65 NY2d 39, 48), here the serious nature and overt manifestations of the father's mental illness, all well documented in the record, supported one expert's conclusion that, under his care, the children's home life would have to be monitored virtually 24 hours a day to ensure that their minimal daily care needs would be met. No such burden is required of a child care agency before parental rights may be terminated for a parent's mental incapacity (see, Matter of Kevin R., 112 AD2d 462, lv denied 67 NY2d 602). Thus, the evidence was amply convincing to sustain Family Court's termination of the father's parental rights.

In the case of the mother, DSS introduced the expert testimony of a physician and two clinical psychologists. The psychologists placed her IQ in the range of 47 to 64, under which she would be classified as moderately to mildly mentally retarded, with a mental age of six years, nine months. Each expert agreed that the mother's retardation originated

in the developmental period, thus satisfying one element of the definition of mental retardation in the termination statute (Social Services Law § 384-b [6] [b]). Moreover, each of the DSS experts opined that her mental retardation was long-standing and would continue into the future, and that if the children were returned to her they would be in danger of being neglected. Specifically, one psychologist concluded from his examination and the mother's history that, because of her own great emotional needs, she would be incapable of meeting her children's needs; that she would be incapable of appropriately responding to stress, such as in an emergency; that her oldest child would tend to assume the role of parent; and that, because of her limited judgment in entering into relationships with men, as shown in the past, her children would be in danger of sexual abuse.

There was also evidence of DSS services provided to the mother to improve her parenting and homemaking skills. This included five sessions with the Home Service Director for United Cerebral Palsy Association, qualified by training and experience to work with the retarded, in conjunction with visitations with the children at the mother's home. It was this witness's conclusion that these sessions did not result in any improvement in parenting abilities. DSS also provided case work and homemaker services, which had no impact. In 1986, DSS also arranged for the mother to attend eight parent effectiveness training classes. Preclass and postclass testing established no improvement in her skills. The foregoing evidence again met the requisite clear and convincing standard that the mother was mentally retarded and that her incapacity then and for the foreseeable future to provide proper and adequate care for the children was such that if they were to return to her custody they would be in danger of becoming neglected (Social Services Law § 384-b [4] [c]; [6] [b]). The demonstrated fact that the provision of protracted homemaker services and of training which was reasonably calculated to improve her parenting skills were all unavailing also confirms Family Court's finding of future incapacity (see, Matter of Joyce T., 65 NY2d 39, 48, supra).

The foregoing conclusion is not shaken by the fact that expert testimony was introduced by the mother to the effect that intensive training could elevate her skills to the point of being able to provide adequate care for her children. In our view, it was not unreasonable for Family Court to have rejected the opinion of the mother's expert. The clinical psychologist appointed by the court to examine the mother

noted that success in using state-of-the-art techniques in training the mentally retarded has been in the area of rote tasks and that there has been no success in training them in parenting skills. The mother's expert conceded a lack of awareness of any professional literature documenting the successful use of the modalities he suggested in training the retarded to employ adequate parenting skills. His explanation of how his suggested training program could be used with the mother to make her able to respond appropriately to, for example, medical emergencies or possible sexual abuse of the children by a paramour was convoluted and unclear. Thus, even apart from the normal deference we accord trial courts sitting without a jury in resolving questions of the credibility of witnesses, even experts (see, Cutro v Duffy, 88 AD2d 1007, 1008), we agree with Family Court's resolution of the conflict in expert opinion. Nor, under the circumstances, did Family Court err in refraining from holding a separate dispositional hearing (see, Matter of Joyce T., supra, at 49).

Orders affirmed, without costs. Mahoney, P. J., Casey, Yesawich, Jr., Levine and Harvey, JJ., concur.